WETMORE AND OTHERS *against* HENSHAW.

Where a ship, captured during her voyage, and her crew taken out and detained prisoners of war, was, afterwards, recaptured, and (the master having hired a new crew) proceeded on her voyage, and arrived at her last port of delivery, and earned freight: it was held that the seamen who were taken out, though never restored to the ship, were entitled to wages for the whole voyage, deducting only their proportion of the salvage paid to the recaptors.

IN ERROR, on *certiorari*, from the justices' court in the city of *New-York*.

The plaintiff below, (*Henshaw*,) an *American* citizen, on the 16th of *February*, 1813, signed shipping articles, in the usual form, as chief mate of the *American* brig *Criterion*, owned by the defendants below, on a voyage from *New-York* to a port or ports in *France*, and back to a port in the *United States*. The plaintiff was to receive 50 dollars per month, one month's wages being paid to him in advance. The vessel sailed from *New-York* on the 18th of *January*, 1813, and, on her outward voyage, was captured by a *British* cruizer, on the 14th of *February* following, who put on board of the brig a prize master and crew of *British* seamen; the plaintiff, and all the rest of the crew of the brig, except the captain, were taken on board the enemy's ship, and never afterwards rejoined the brig. About two days after the capture, the brig was recaptured by an *American* privateer, and carried into *Port Passage*, in *Spain*, where she ar-

rived on the 23d of *February*, and after being detained by bad weather about a month, was carried by the recaptors into *Bayonne*, in *France*, where one half of the vessel, cargo, and freight were, by a decree of the *American* consul, adjudged to the recaptors, for *salvage*. To ascertain the amount of the *salvage*, the brig was put up for sale at auction, and bought in by the original owners, and proceeded to *La Teste*, in *France*, where she arrived in *October*, and took in a return cargo, and sailed for *New-York*, where she arrived the 7th of *March*, 1814, having earned freight for the whole voyage, throughout, subject to the *salvage* paid to the recaptors on her outward passage. After the brig was restored by the recaptors, a new crew was employed to navigate her, at an increased rate of wages. The plaintiff having been detained as a prisoner of war in *England*, arrived at *New-York*, in a cartel, soon after the arrival of the brig; and brought his action against the owners, in the court below, to recover the whole of his wages.

The cause was tried by a jury, and the court charged them to find a verdict for the plaintiff for full wages during the whole voyage, deducting the month's wages paid in advance, and the proportion of *salvage;* and the jury, accordingly, found a verdict for the plaintiff for 325 dollars, on which the court below gave judgment.

*Griffin*, for the plaintiff in error. Where a party comes into court to enforce the performance of a contract, he must show a performance of it, on his part The plaintiff, in the present case, does not pretend that he has performed the services for which he engaged. It is true that his failure has been occasioned by superior force, not by his own fault : but, on the other hand, it has not been occasioned by the fault of the owners. It is the misfortune of the plaintiff. He cannot call on the defendants to pay him wages, for he has not fulfilled the contract on his part. He cannot rest his claim on a *quantum meruit* for services, for he has rendered no service.

I have been able to find but one case in which the precise question, now before the court, has been decided ; that is, the case of the *Friends*, in the Instance Court, before Sir *William Scott*,[*] who held, that a mariner captured in a ship, taken and carried to *France*, though the ship was recaptured, and arrived to her port of destination, was not entitled to his wages beyond

[*] 4 *Rob. Adm. Rep.* 143.

ALBANY,
August, 1815.

WETMORE
v.
HENSHAW.

\* 1 Peters'
Adm. Dec. 123.
See also,
Hart v. Little-
john, ib. 115.

† 1 Peters'
Adm. Decis.
132.

‡ 3 Esp. N. P.
Cases, 36.

§ 2 Mass. Rep.
39.

‖ 1 Bos. & Pul.
637.

\*\* Cited in
Wiggins v.
Ingleton, Ld.
Raym. 1211.
See Abbot on
Ship. (3d Ed.)
445. p. iv. ch.
3. s. 2 b.

the time of capture. He considered it as a case of private hardship arising out of the events of war.

It is true that Judge *Peters*, in the case of *Howland* v. *The Lavinia*,\* allowed the claim for wages by a mariner, who had been taken out of the captured vessel, which was afterwards recaptured, and, on paying salvage, arrived at her port of destination, and earned freight; but that was the case of a *neutral* carried in for adjudication, which is very distinguishable from the case of a capture between belligerents: and the learned judge himself, in a note to that case, makes this distinction, and thereby recognises the doctrine as laid down by Sir *William Scott*, in the case of the *Friends;* and in the case of *Watson* v. *The Rose*,† he held that an *American* seaman, *impressed* out of an *American* vessel by a *British* cruiser, was not entitled to wages, though the vessel completed her voyage, and earned freight. The case of *Bergstrom* v. *Mills*,‡ was that of a *Swedish* seaman on board of a *British* ship; and he continued on board until the recapture. The case of *Brooks* v. *Dorr*,§ decided in the Supreme Court of *Massachusetts*, was that of a neutral vessel, an *American*, taken and carried into *France*, and afterwards released; and the case comes within the distinction stated by Judge *Peters*.

Capture puts an end to the contract. Then what is the effect of a recapture ? If the seaman continues on board to the time, and is in a situation to perform services, he is entitled to wages, on a *quantum meruit*, but not on the ground of the original contract. The case of *Curling* v. *Long*,‖ though a case of freight, is analogous in principle. *Eyre*, Ch. J., says, that where a ship, after capture and recapture, completes her voyage, the master, or owner, is entitled to a recompense; not, however, on the foot of the old contract, but on the new contract, which springs out of it ; for the shipper having received his goods, with the benefit of carriage, a meritorious consideration arises, which entitles the master to be paid for the transportation. So, in the present case, if the plaintiff had remained on board, until the recapture, he could have maintained *assumpsit* for services rendered, on a *quantum meruit*, but not on the original contract for wages.

Though *ransom* is no longer permitted in *England*, it may be well to see how the law stood there when that practice was permitted. In the case of *Chandler* v. *Meade*,\*\* *Holt*, Ch. J., said, that a mariner on board a vessel captured by the enemy, and

ransomed, was not entitled to wages, though the ship arrived in *England*, and delivered her cargo.

It would be extremely hard and unjust, if the merchant, after paying a large sum for *salvage*, and being obliged to hire a new crew for higher wages, should also be obliged to pay the wages of the old crew, who were taken out by the captors. The hardship of the case will be more striking, if we suppose several captures and recaptures, with *salvage*, and the expense of new crews. It is surely just, at least, that the old crew, if they claim their wages, should contribute to the expense of hiring the new crew, as well as the *salvage*.

*Anthon* and *T. A. Emmet*, contra. The error in the reasoning on the other side, arises from considering the contract for seamen's wages as governed by the same principles as other contracts. But it is an anomalous contract, resting on the peculiar principles of maritime law. The maxim is, that freight is the mother of wages; and the safety of the ship is the mother of freight.[*] Cases may arise in which the seamen have performed their services to the last day, and a casualty may intervene which may deprive them of their wages. On the other hand, cases may exist where a seaman has performed no more than a day's service, and yet he may be entitled to recover wages for the whole voyage.[†](a) The right of a seaman to recover his wages does not depend on the implied *assumpsit* arising from the performance of services, or a *quantum meruit*. The court, if there is no cause of forfeiture, only inquire whether *freight* has been earned or not. If freight is earned, nothing but the fault of the seaman will deprive him of his wages. Thus, *sick* and *disabled* seamen, or those taken out of a *neutral* vessel carried in for adjudication, have been held entitled to their wages, where the ship has reached her destined port, and earned freight.

Though capture annuls the contract, recapture revives it. Capture puts an end to the contract only because it renders it impossible to be performed; for the same reason, it puts an end to the charter-party: but a recapture completely restores it. It may be rather said that capture suspends the contract until

ALBANY,
August, 1815.

WETMORE
v.
HENSHAW.

[*] *Dunnell v. Tomhagen*, 3 *Johns. Rep.* 156. *Icard v. Goold*, 11 *Johns. Rep.* 279. *Eaken v. Thorn*, 5 *Esp. N. P. Cas.* 6.

[†] *Chandler v. Grieves*, 2 *H. Bl. Rep.* 606. Note. 1 *Peters' Adm. Rep.* 125. 128. 142. 155. and *Sims v. Jackson*, in note.

(a) In the case of *Chandler v. Grieves*, cited by the counsel, the verdict was for the wages only to the time the ship left *Philadelphia*, and the court having discharged the rule, the judgment could have been for no more than the verdict.

WETMORE
v.
HENSHAW.

the ultimate effect or event is known. If the contract was absolutely and entirely annulled by capture, then, though the vessel might be recaptured the next day, the seamen might leave the ship.

Ship owners and seamen may all be regarded as partners in the same adventure; they encounter a common peril, and share the common calamity. In the case of the impressment of a particular seaman, it is his individual and personal injury, not a common calamity or peril. All the cases to be found in the books are in favour of the plaintiff below, except the case of *" the Friends,"* decided by Sir *William Scott.* He appears to have taken up that case, *ut res nova,* without examining prior decisions or authorities, and has decided upon what he thought to be the equity of the case. We shall not attempt, as has been done by Judge *Peters,* to support that decision, by a distinction between a belligerent and neutral capture. We meet it, at once, and say it is not law; unless, perhaps, it may be saved by the distinction noticed by *Parker,* J., in *Brooks* v. *Dorr,* that the seamen entered upon the voyage, under a special contract, *by the run,* so that their wages depended on the contingency of the vessel's arriving at her port of destination. *Parsons,* however, who was counsel in that case, did not put it on that ground. He admitted the general rule; but insisted, that as the seaman did not return to his ship as soon as she was liberated, it amounted to a voluntary desertion. Lord *Eldon,* in the case of *Bergstrom* v. *Mills,* did not assent to the doctrine of Sir *William Scott,* as to capture, but admitted the general rule, and put the case on the ground that the vessel arrived at her port of destination, and earned freight. The case of *Beale* v. *Thompson*[*] also supports the doctrine for which we contend, that where freight is earned, and there is no fault in the seaman, the act of God, or a public enemy, as an accidental wound, sickness, or capture, will not deprive him of his wages. The same principle is to be found in the *French* ordinance.[†]

That the master has been obliged to hire a new crew to carry on the ship to her ultimate port of destination, can make no difference in this case, any more than in the case of hiring a mariner, in the place of one who has become sick or disabled by accident.[‡]

* 4 *East's Rep.* 546—566.

† *Valin,* 748, 749. *Liv.* 3. *tit.* 4. *art.* 17.

‡ 1 *Peters'* *Adm. Dec.* 116—149.

*Wells*, in reply. Capture puts an end to the contract for wages during the voyage in which freight was to become due; and the reason is, that the contract cannot be performed by the parties.* Recapture restores the contract, because the capacity to perform is restored. But where a seaman is separated from his ship, he cannot perform his contract. His capacity to perform is not, in that case, restored; and it is on the ground of his being in a capacity to perform his contract, not that the vessel has performed her voyage, that he becomes entitled to wages. Suppose a vessel abandoned, from necessity, at sea, should, afterwards be taken possession of, and carried into her port of destination, could the seamen who had abandoned her claim their wages?

In *Beale* v. *Thompson*,† Lord *Ellenborough* says, " the right of the mariner to wages depends, first, upon the earning of freight by his owners in that voyage for which he is hired; and, secondly, upon the performance by the mariner of the service he has agreed to perform, in respect to such owners, during the voyage." But the counsel on the other side puts the performance of service out of the case, and makes the right of the mariner to wages to depend solely on the earning of freight. It has been said that the act of *God*, or the king's enemies, cannot injure the plaintiff's rights. The act of *God* may excuse the non-performance of the contract; but it can afford no foundation for a claim for wages, where no service has been performed.

In all the *English* cases, except, perhaps, that of *Bergstrom* v. *Mills*, the seaman, after the accident, has been restored to his ship, and in a capacity to perform his contract. In the case of *Pratt* v. *Cuff*, tried before Lord *Kenyon*, and cited in *Thompson* v. *Rowcroft*,‡ and in *Beale* v. *Thompson*, the seaman, after being imprisoned seven months, was released, with the vessel, and proceeded in her on the voyage. A seaman, in such case, is considered as restored, by way of *remitter*, to his former state, and the contract as having continued without interruption. It is like a seaman's returning to his duty, and being received by the captain, after a forfeiture of wages. In the case of *Bergstrom* v. *Mills*, it is not distinctly stated that the seaman was not restored to his ship, or that he was in a capacity to perform his stipulated services. It is fairly to be inferred, however,

ALBANY, August, 1815.

WETMORE
v.
HENSHAW.

* *Anon. Sid.* 179. *Wiggins v. Ingleton*, *Lord Raym.* 1211. *Chandler v. Meade*, *ib. cit. Hornaman v. Bawden*, 3 *Burr.* 1844 *Yates v. Hall*, 1 *Term Rep.* 79. *per Buller*, J.

† 4 *East's Rep.* 546—862.

‡ 4 *East*, 43. *Ib.* 580.

ALBANY,
August, 1815.

WETMORE
v.
HENSHAW.

that he was restored, and did perform his contract; and if that was the fact, (a) then that case agrees with all the other cases decided in *England*. On the principles of the common law, then there can be no question.

But it is contended, that, by the principles of the *marine law*, it is enough to entitle the seamen to wages, if freight has been earned, and he has been disabled from performing his contract, by no fault of his own. We impute no fault to the plaintiff. It was his misfortune; but we insist that we ought not to bear his misfortune as well as our own.

As to the rule relative to seamen disabled by *sickness*, that rests on the principles of the common law and humanity. If a servant is taken sick in his master's service, the master cannot turn him adrift, but is bound to take care of him during his sickness. Sickness is a temporary disability; the party may return to his duty; and, on principles of common law and common sense, he ought not to lose his wages.

As to the *death* of seamen, it has been said, that if a seaman dies during the voyage, his legal representatives may recover his wages for the whole voyage remaining to be performed. But this is manifestly unreasonable. Sickness produces a temporary incapacity, but death puts an end to the possibility of the seaman's performing the residue of his contract. It is true that Judge *Peters* so decided, in the case of *Watson* v. *The Neptune*,[*] and gave wages to the administrators of a deceased mariner to the end of the voyage; and he grounded his decree on what he supposed to be the principles of the laws of *Oleron*, of *Wisbuy*, and of the *Hanse Towns*; but if those ancient laws and ordinances are attentively examined, it will be found that they do not bear out the decision of that learned judge. The question which those laws intended to decide was, whether a mariner, who had died before the completion of the voyage, was entitled to any wages, and they declare that he shall have his *full wages*, that is, without any deduction, up to the time of

[*] 1 Peters'
Adm. Rep. 142.

(a) *Comyn*, in his treatise on Contracts, (vol. 1, p. 375.) seems so to understand it. He states the principle decided in that case to be, that "if a ship is captured in the course of her voyage, but is afterwards recaptured, and arrives, *with her crew*, at the port of delivery, the seamen are entitled to their wages."

his death.(a)  This was the construction put upon those laws by Judge *Davis*,* of *Massachusetts*, in a case which came before him in the District Court of the *United States*.(b)  It is true that the decision of Judge *Peters* was affirmed by Judge *Washington*, on appeal to the circuit court of the *United States*, in the case of *Jackson* v. *Sims*;† in 1806 ; but in *Carey and others* v. *The Kitty*, in the District Court of *South Carolina*, Judge *Bee*, in 1808, with those opinions of Judge *Peters* and

ALBANY, August, 1815.

WETMORE v. HENSHAW.

§ Abbott on Ship. (Storey's ed.) 478; in note.
† Peters' Adm. Rep. 157.

(a) The expressions of the law of. *Oleron* are : " Item, quand il arrive qu'aucun maladie attaque un des mariniers de la Nef, *en rendant service* en la dite Nef, le maitre le doit mettre hors de la dite Nef, et luy doit trouver logis," &c.  "' Et si la Nef étoit preste a faire voyage, elle ne doit point demeurer pour luy ; et s'il guerit, il doit avoir son loyer *tout comptant*, en rabutant les frais, si le maitre luy en a fait : Et s'il meurt, sa femme et ses prochains le doivent avoir pour luy." *Jugemens D'Oleron*, l. 7. *Cleirac*, in his commentary on this article, says, that the 19th article of the Ordinances of *Wisbury*, the 45th article of the laws of the *Hanse Towns*, the 27th of the ordinances of *Charles* V., and the 16th of *Philip* II., compiled for the *Low Countries*, are all compiled or extracted from this law of *Oleron*, and are exactly similar, in regard to a mariner who falls sick, whether he recovers his health, or dies during the voyage. *Cleirac, Les us et Coutumes de la Mer.* p. 25. See also p. 143—174.  These different maritime laws and ordinances may be traced up to the very ancient and celebrated code entitled *Il Consolato del Mare*, as the source from whence they have been derived.  In the edition of the *Consolato*, printed at *Venice* in 1737, with the Commentary of *Casaregis*, chap. 125, 126, 127, it is said, " That if a mariner shall be taken sick and die in the ship, he shall be paid all his wages." *Se marinaro che sarà ammalato et morira nelle nave, debba essere pagato di tutto il suo salario.* (cap. 125.)  " A mariner hired for the voyage, who, by the will of God, dies before the ship sets sail, ought to have a *fourth* part of his wages, which shall be delivered and paid to his heirs ; and if he should die after the ship has set sail, and before she arrives at her port, the *half* of the wages is due to the deceased mariner, and ought to be paid to his heirs : and if he has received the whole of his wages before his death, the whole shall belong to him, and go to his heirs." *Marinaro che sarà accordato in viaggio, et per volontà di Dio muore innanzi di haver fatto vela, debba haver il quarto del salario, et sia consignato, e dato a gli heredi ; et se morira dipoi che havesse fatto vela, et innanzi che fusse dove la nave fara porto, le meta del salario debba essere del morto, et debbasi dar alli suoi heredi, et si havesse ricevuto tutto il salario innanzi che morisse, tutto debba esser suo, et dato a i suoi heredi, che patrone di nave, ne di navilio non puo niente contrastare, ne dimandare.* (cap. 126.)  "' If the mariner is hired by *the month*, and shall die, his wages, for the time he has served, shall be paid to his heirs." *Se il marinaro è accordato a mesi, et morira, sia pagato et dato alli suo heredi per quello che havesse servitto.* (cap. 127.) These three chapters should be taken together ; and the general position stated in the 126th chapter is to be understood with the distinctions and explanations contained in the two following chapters.  It is so understood by *Casaregis*, in his Commentary ; and the same distinctions as to the time when the death happens, and the terms of the contract of hire, are adopted in the ordinances of Charles V., and in the Marine Ordinance of France. It is clear, from a careful examination and comparison of all these ancient ordinances with the commentators, that the construction put by Judge *Davis* on the *Law of Oleron*, is the true one : viz., that a seaman who is taken sick in the service of the ship, and dies, is entitled to his wages to *the time of his death*, without any deduction for the time of his sickness.

(b) This was the case of *Natterstrom*, administrator of *Taylor*, v. Ship *Hazard*, decided 31st *May*, 1809.  The elaborate and learned opinion of the Judge, in this case, is to be found in the second volume of *Hall's Law Journal*, p. 359—382.

ALBANY,
August, 1815.

WETMORE
v.
HENSHAW.

*Ordon. de la
Mar. art. 13,
14. 1 Valin.
Com. Liv. 3
tit. IV. p. 746.

Judge *Washington* before him, decided differently, and allowed wages for the deceased seaman to the time of his death only. So far, then, as the opinions of the judges of the courts of the United States are to be regarded, they are equally divided. The *French* Ordinance* declares, that where a seaman, hired by the month, dies during the voyage, his heirs shall be paid his wages to the time of his death; and where the hiring is for the whole voyage, out and home, for an entire sum, his heirs are entitled to half that sum, if he dies on the outward voyage, and the whole, if he dies on the return voyage. And *Heath,*

†3 Bos. & Pull.
406—427.
See S. C.
4 East, 546.

‡ Abbot on
Ship. part 4.
ch. 2. s. 3.
§ 6 Term Rep.
320.

J., in the case of *Beale* v. *Thompson,*† considers a seaman dying in the course of the voyage as entitled only to a proportionate part of his wages. *Abbot* seems to doubt whether a seaman, in such case, is entitled to any wages.‡

In the case of *Cutter* v. *Powell,*§ the master gave a note, promising to pay the seaman thirty guineas, provided he continued on board and did duty for the voyage from *Jamaica* to *Liverpool.* The seaman died before the ship reached *Liverpool,* and the court of *K. B.* decided, that his administratrix was not entitled to recover the stipulated wages, either on the contract, or on a *quantum meruit.*

* Wiggins v.
Ingleton, 2
Lord Raym.
1211.

In the case of a mariner *impressed* during the voyage, Lord *Holt** held that he was entitled to wages, *pro tanto,* or for the part of the voyage he had performed before he was impressed. In that case the seaman was taken out by *vis major,* and the ship arrived safe, and earned freight. On the principle contended for by the counsel for the defendant in error, he ought to have recovered his whole wages; but Lord *Holt* decided otherwise; and on what principle, unless it was that he had not performed the services for which he had contracted?

Judge *Peters* does not question the authority of the decision of Sir *Wm. Scott,* in the case of the *Friends,* but the distinction which he states, and which is a clear and sound one, supports that decision. The *French Ordinance,* (art. 16.) and *Valin,* regards the capture of a seaman by an *enemy* or *pirate,* as his peculiar misfortune, and declares that he can have no claim whatever against the master or ship owner for his ransom or wages. And the 17th article of the same ordinance declares only, that if a sailor, sent by water or on shore, *in the service of the ship,* should be taken and be made a slave, his ransom shall be paid at the expense of the ship, without pre-

judice to his claim for wages. This *Valin* considers as a totally different case from that of a capture by an enemy, or where a pirate takes out a particular seaman and makes him a slave. Again; it may be observed that the vessel and cargo were sold in *France* to pay salvage; she was purchased in, and a new crew hired. Must not, then, the former voyage be considered as having ended in France?

THOMPSON, Ch. J., delivered the opinion of the court.

The plaintiff below, as mate of the *American* brig *Criterion*, signed the usual shipping articles for a voyage from *New-York* to a port in *France*, and back again to the *United States*. On the voyage, the brig was captured by a *British* ship of war, and the plaintiff and the rest of the crew were taken from on board, and never afterwards rejoined the brig. About two days after the capture, the brig was recaptured by an *American* vessel, and restored, on payment of salvage, and performed her voyage, and earned freight. The plaintiff claimed, and has recovered, in the court below, his full wages for the voyage, deducting his proportion of the salvage, and the advance of one month's wages. The question now submitted to this court is, whether this recovery can be supported?

There is little satisfaction to be derived from the examination of adjudged cases on this subject; for we find much confusion, and great diversity of opinion, among very able and learned judges on the question. From an attentive examination, however, both of the *English* and *American* decisions, I am satisfied, that the weight of authority and principle is in favour of allowing full wages. It is a contract of a peculiar kind, owing to the nature of the service, and is regulated by principles of policy which are calculated to secure the faithful service of seamen. The governing rule is, that wages are payable out of, and depend upon, the fund created by the earning of *freight*, and not upon the performance of service. Hence, it has become a maxim, that freight is the mother of wages. The event of earning freight seems to be the contingency upon which the right to wages is to depend. It may seem, at first view, unjust, that ship owners should be compelled to pay wages when no service has been performed; but it would be, at least, equally hard upon seamen, to deny to them their wages, when the non-performance of the service was not occasioned by their own fault or misconduct, but by

a *vis major*, over which they could have no control. The great principle upon which the counsel for the plaintiffs in error seem to have rested the cause is, that the capture dissolves the contract, and that the seaman's right to wages, afterwards, depends upon the performance of services. This proposition appears to me too broad to be supported. If the contract be dissolved, and entirely at an end, it would be optional with the ship owner, upon recapture, whether or not to employ the same seamen. But this never could be admitted. No case will be found to warrant such a principle. If the seamen are ready and willing to perform the service, agreeably to the terms of the shipping articles, there can be no doubt but that the master would be bound to receive them. The effect of the capture is to dissolve the contract, if no restoration takes place, because it cannot be executed; but if, by any subsequent event, it can be carried into execution, the rights of the parties are restored, and the performance of the contract is deemed only to have been suspended.

In the case of the *Friends*, (4 *Rob. Ad. Rep.* 116.) which has principally been relied upon by the plaintiffs in error, Sir *William Scott* seems to admit, that the recapture revives the contract, as to the seamen on board at the time of the recapture. It is not, however, to be denied, but that the point decided in that case is directly against the right to recover wages in cases like the one before us. In opposition to this, however, may be put the case of *Bergstrom* v. *Mills*, (3 *Esp. Rep.* 36.) where Lord *Eldon* says, there is no doubt, that if a ship does not perform her voyage, the sailors have no title to wages. But it is equally certain, that if the voyage is performed, a temporary interruption shall not defeat the claims of the seamen. The temporary interruption here alluded to, was a capture, and detention of the vessel until recaptured.

In the case of *Curling* v. *Long*, (1 *B. & Pul.* 637.) Lord Ch. J. *Eyre*, considers capture as putting an end to the contract of freight; and that recapture and services performed, would raise a consideration that would support an action of *assumpsit*, not on the foot of the old contract, but on a new contract which springs out of it. Lord *Alvanly*, however, in *Beale* v. *Thompson*, (3 *B. & Pul.* 430.) denies this doctrine. He says, " I admit that capture puts an end to the contract ; but I do not admit, nor do the cases establish, that capture one day, and recapture the next, will put an end to the contract ;

and with great deference to the *dictum* of Lord Ch. J. *Eyre*, in the case of *Curling* v. *Long*, I think that capture and recapture do not put an end to the voyage. That capture, followed by a total loss does, but capture followed by recapture does not ; and God forbid it should ; for when a ship is taken *infra præsidia hostis*, and becomes the prize of the enemy, if capture puts an end to the voyage, the sailors are not interested to retake the vessel, for although the crew should rise on the enemy, and recapture and bring back the ship, they are to be told, she has been captured, which puts an end to the contract for wages."

The view here taken of the effect of capture and recapture upon the voyage, and the contracts in relation to it, appear to me to be founded in good sense and sound policy. It would be useless for me to travel over all the cases, and notice the various opinions which have been thrown out on this point ; they are certainly not reconcileable with each other. And it strikes me, that the one maintained by Lord *Eldon* and Lord *Alvanly*, is the most fit and proper to be adopted. To these might be added that of Lord *Ellenborough*. (4 *East*, 558.) *Molloy* also lays down generally, that if a ship be taken, and afterwards retaken, and restored, and proceeds on her voyage, the contract is not dissolved.

If, then, the contract has not been dissolved, upon what principle can the seamen be denied their wages? The voyage has been performed, and freight earned, and no voluntary act done by them to forfeit their wages. That the right to wages does not depend upon the actual performance of service is settled by the case of *Chandler* v. *Greaves*, (2 *H. Black.* 606. note.) In that case, the seaman was taken sick, and left on the voyage ; and Lord *Loughborough*, at the trial, thought he was not entitled to wages: but the court, upon a motion for a new trial, said that the marine law ought to be followed in the construction of the contract, and directed an inquiry to be made as to the usage in the court of admiralty in such cases ; and it was ascertained to be the established rule, that a disabled seaman was entitled to his wages for the whole voyage, although he had not performed the whole. The same rule is laid down by *Abbot*, (354.) who observes, that as a seaman is exposed to the hazard of losing the reward of his faithful services during a considerable period, in certain cases, so, on the other hand, the law gives him his whole wages, even when he has been unable

to render his services, if his inability has proceeded from any hurt received in the performance of his duty, or from natural sickness happening to him in the course of the voyage. And such is also the rule of the laws of *Oleron*, (art. 6. and 7.) the great leading principles of which are received and adopted by most of the commercial nations of Europe as a part of their maritime code. If such be the established rule with respect to sick and disabled seamen, it must apply with equal, if not greater force, to seamen forcibly taken from a vessel. There is the same loss of service in the one case as in the other; and the same expense incurred by the owner to supply their places.

On an examination of the decisions of the courts in this country, so far as they have fallen under my observation, it appears to have been uniformly considered, that seamen, in cases like the present, were entitled to full wages. This precise question has frequently come under the consideration of Judge *Peters*, in the district court of *Pennsylvania*, where he has held, that a seaman is entitled, or not, to wages, according to the fate of the freight, which is a particular fund upon which his right is to depend. If this fund is lost, the seaman suffers with the ship owner, and reaps not the reward of his dangers and his toils. But he is entitled to wages in all cases where the defect of service is not imputable to himself. If he has been prevented from performing the voyage by force, he is to be paid full wages, deducting what he may have earned in other service. It is highly fit and proper that a seaman should lose his wages where the non-performance of his contract is imputable to his own fault, negligence, or misconduct; but he ought not to suffer, or have his risk or responsibility increased by circumstances he could not control, where the fund to which he was to look, though temporarily in danger, is ultimately safe. (1 *Peters' Adm. Dec.* 115, 123.)

The principles upon which these decisions are bottomed, have been sanctioned and affirmed by Judge *Washington*, in the circuit court of the *United States.* (2 *Peters' Ad. Dec.* 184.) Cases like this have been considered, in principle, as standing on the same footing with those where the non-performance of service has been occasioned by sickness; in which case, although death ensues before the termination of the voyage, full wages have been decreed by Judge *Peters*, and sanctioned by Judge *Washington*. (1 *Peters' Ad.* 142. 157. and 157. note.)

And this is, indeed, conformable to the principle adopted in *Chandler* v. *Greaves*, already referred to. Judge *Bee*, in the case of *Carey* v. *Schooner Kitty*, (1 *Bees' Rep.* 255.) held a different doctrine, and limited the recovery of wages to the death of the seaman; although he admitted that, according to the laws of *Oleron*, *Wisbuy*, and the *Hanse Towns*, wages for the whole voyage were recoverable; but he thought proper to follow the *French* ordinances, which, he said, were otherwise. The case of *Brook* and *Dorr*, decided by the unanimous opinion of the supreme court of *Massachusetts*, (2 *Mass. Rep.* 39.) is directly in point on this question, and is entitled to very respectful attention. The late chief justice of that state, who was counsel for the defendant, did not pretend but that the plaintiff was entitled to his full wages, but argued that they were to fall upon the underwriters, and not upon the ship owners, they having abandoned. He admitted, that it was a general rule, that if a seaman has done nothing by which he has incurred a forfeiture of his wages, he is entitled to them, until the completion of the voyage; and said there was no case where wages had been recovered for part of a voyage, unless where the mariner had died during the voyage.

Upon the whole, therefore, I think that the weight of judicial opinions on this subject is decidedly in favour of allowing to the plaintiff below his full wages; and that this is in conformity to the principles and policy which ought to govern the construction of contracts for seamen's wages. The judgment of the court below must, accordingly, be affirmed.

Judgment affirmed.