ARGUED AND DETERMINED,

IN THE

# COURT OF COMMON PLEAS

FOR· THE

CITY AND COUNTY OF NEW YORK.

———— ⟶ ◦ ◄ ◯ ►• ◁ ——————

EDWARD R. WORTH *v.* BENJAMIN A. MUMFORD, and others.
JOSEPH C. BEALS *v.* THE SAME.
REUBEN S. THOMPSON *v.* THE SAME.
NICHOLAS L. BURBANK *v.* THE SAME.
CHARLES T. STEWART *v.* THE SAME.
DAVIS HALL *v.* THE SAME.
ALONZO M. GRAY *v.* THE SAME.
GEORGE COLEMAN *v.* THE SAME.

The rule by which seamen lose their wages by the loss of the vessel is one of public policy, founded upon the assumption that such a rule is essential to stimulate them to use every exertion for the safety of the ship, but it applies only in cases where there is a total loss of vessel and cargo.

Where there is not a total loss, the seamen's contract continues in force as long as anything is essential to be done in the rescue and preservation of whatever can be saved of the vessel or cargo, and up to the time that the seamen are engaged in the discharge of that duty they are entitled to wages, if they have faithfully performed their duty. When, however, by capture or perils of the sea, the vessel and cargo are totally lost, their contract is at an end and the rule of public policy applies.

The right to wages does not grow out of or depend upon the earning of freight. It has its foundation in the seaman's contract and the faithful performance of it on

his part, and the maxim that "*freight is the mother of wages*," in the view that they depend upon the earning of freight, is erroneous. *Per Daly, J.*

The origin of this maxim and the erroneous views to which it has given rise, together with the history, the reasons for and nature of the maritime policy by which the interest of the seamen is connected with the safety of the ship, commented upon and discussed. *Per Daly, J.*

A seaman, as long as his contract continues in force, cannot act in the capacity of a salvor or become entitled to compensation as such, but is bound by his contract to exert himself to the utmost to save and preserve whatever can be rescued from the wreck. *Per Daly, J.*

In addition to the personal liability of the master and owner under the contract, the seaman has, by way of security, a lien upon the vessel as long as a fragment of it remains, and upon the freight, if any is earned before or after the breaking up of the voyage. *Per Daly, J.*

The seamen's right to wages does not depend upon whether sufficient is saved from the wreck to pay them, or upon whether freight enough has been earned or may be earned for that purpose. The seamen's lien upon the vessel and freight is a security collateral to the principal contract, which is not created by the act of shipwreck, but which existed from the beginning and which is never wholly extinguished as long as a fragment of the vessel remains or there is a probability of freight being earned upon any part of the cargo saved. *Per Daly, J.*

A vessel bound from Callao to Baltimore, after having encountered severe gales, was brought, by great exertion on the part of the seamen, into the harbor of Pernambuco, by which the cargo was secured in safety though the vessel had to be abandoned as a wreck.

*Held*, That the seamen were entitled to their wages up to the time when their labor ceased in the landing, securing and preservation of the cargo.

The cargo having been shipped by another vessel to Baltimore, by which the owners of the abandoned vessel became entitled to freight, *held*, that freight had been earned, if the earning of it was essential to entitle the seamen to their wages, though the cost of transporting the cargo from Pernambuco to the port of delivery amounted to a greater sum than the owners of the wrecked vessel were to receive if the original voyage had been completed.

A receipt by the seaman of his share of the proceeds from the sale of the vessel is not conclusive upon his claim for the balance of his wages, especially where it is signed under a threat from the consul that he should get nothing unless he signed it. Even if the receipt had been in full, it would not, under such circumstances, be conclusive against the seaman.

An entry in the log-book is, by the act of 1790, evidence of desertion, and if there is no other it is conclusive, but to make it so the statute must be strictly complied with, and it must appear to have been entered on the day when the seaman left, and from the entry that he left without leave.

Parol evidence is admissible to contradict the entry, and where the entry was shown to have been interpolated after the alleged day of desertion, and there was evi-

dence that the seamen did not leave the vessel, a finding of the fact contrary to the log-book was sustained.

An entry in the log-book is not evidence *per se*, unless where the statute makes it so. It cannot, therefore, be received to show a general maritime desertion.

A general maritime desertion may be shown against the claim for wages, though no entry of the fact has been made in the log-book. It is otherwise, however, when the owner relies upon a forfeiture, under the act of 1790, of a day's wages for every hour that the seaman are absent without leave.

THESE actions were brought in the Marine Court to recover the wages of the plaintiffs as seamen on board the ship Palestine, on a voyage from San Francisco, bound for a port in the Atlantic states.

The defendants denied the indebtedness and alleged payment, desertion, breach of contract on the part of the plaintiffs, and that the vessel earned no freight.

In the suit of Beals it was set up as an additional defence that the vessel was condemned and sold in a foreign port and proceeds distributed, he receiving his proportion of the proceeds in settlement and satisfaction of his demand.

The amount claimed in each case was $487.50, and the facts appearing at the trial were, that the plaintiffs respectively shipped as mariners on the ship for a voyage from San Francisco to one or more ports in Peru, at a stipulated rate of wages, and from thence to a port of discharge in the United States, at the "going rate of wages." The ship proceeded to Callao and from thence to the Chincha Islands in ballast, where she took in a cargo of guano, after which she returned to Callao, and from thence proceeded on her voyage to Baltimore. After rounding the Cape she encountered heavy gales in the Atlantic, during which she sprung a leak, leaking at the rate of fifteen hundred strokes an hour, and after incessant labor at the pumps for fourteen days the ship and cargo were brought in safety into the harbor of Pernambuco. Upon the arrival of the ship at that port she was found to be in so disabled a state that a survey was ordered, and the surveyors certified that she was in an unsafe condition to proceed on her voyage, and they recommended that her cargo be discharged as expeditiously as possible. Her cargo

was accordingly discharged, after which another survey was ordered, and the surveyors certified that it would cost more to put her in repair than the value of the ship, and they recommended that she be sold at public auction to the highest bidder, for the benefit of all concerned. The vessel was accordingly sold and the cargo was shipped by another vessel to Baltimore, at a cost of $13.88 a ton, that being the lowest rate at which its transportation could be obtained from Pernambuco to Baltimore, and which was $1.88 more per ton than the rate at which the owners had agreed to carry it from the Chincha Islands to Baltimore; that is, it cost the owners more to complete the contract than they were to receive from the freighter at the Chincha Islands.

Judgment in each case was rendered for the plaintiff, and the defendants appealed to this court.

*Israel T. Williams,* for appellants, cited the following cases: *The Dawn,* Ware's R. 490; *The Niphon's Crew,* 3 Law Reporter N. S., 288, 289; *The Dawn,* Davies' Rep. 142; 1 Peters' Adm. R. 253; *The Saratoga,* 2 Gall. 477; *Cloutman* v. *Tunison,* 1 Sumn. R. 373

*Benjamin D. Silliman* and *James B. Bullock,* for respondents cited Curtis' Rights, &c., of Merchant Seamen, 271; 2 Dodson's R. 403; 3 Kent Com. 188, *et seq.*; *Porter* v. *Andrews,* 9 Johnson, 350; *Dunnett* v. *Tomhagen,* 3 id. 156; 11 id. 279. &c.

DALY, J.—Upon the facts shown, the first question that arises is, whether the plaintiffs can claim wages up to the time when the voyage was put an end to by the condemnation and sale of the vessel at Pernambuco. It is insisted, on the part of the defendants, that, as the voyage was not completed, but was interrupted, and its further prosecution rendered impossible from no act of theirs or of their agents, but from inevitable casualty, no freight was earned by the vessel, and that that puts an end to all claim on the part of the seamen for wages. The repairing of the ship, and the further prosecution of the voy-

age by her, was not a physical impossibility. As long as the keel of the vessel remained, it was possible to restore her to her former condition; but where the expense of repairing her—as was the fact here—would be equal to her full value, the owners are under no obligation to repair, but may treat the vessel as an entire wreck, and dispose of what remains of her.

The policy of connecting the interests of the seamen with the safety of the ship is deeply rooted in the maritime law; and as that law has been understood and expounded in England and in this country, in France and in Sweden (Pardessus, Lois Maritime, Tom. 3, pp. 120, 250), it would warrant the impression that it was a general maritime rule that seamen lose their wages if the vessel is lost before the end of the voyage, unless freight is earned sufficient to pay them, or enough is saved for that purpose of the materials of the vessel. To which has been superadded in England the doctrine that wages depended upon the earning of freight, or, as it has been expressed in the form of a maxim, that "freight is the mother of wages."

But there has never been such a general maritime rule. It has become the law of France, by the marine ordinances of Louis XIV, of 1681, attributed to Colbert; of Sweden, by the ordinance of Charles XI (3 Pard. 170) ; and has crept into the English law, with no higher authority for it than the source from which the ministers of Louis XIV. would seem to have derived it. That authority is a very doubtful construction given by French writers to the third article of the Laws of Oleron, a compilation formed about the year 1150 for Eleanor, Dutchess of Guienne, relating solely to the navigation of the Sea of Gascogny, and from Bordeaux to Rouen. (Azuni, Part I, Chap. IV, Art. X.) The clause relied upon in the article is a provision requiring seamen, in case of wreck, to use their best endeavors to save as much of the vessel and cargo as possible, and obliging the master to allow them a reasonable compensation from the proceeds of the property saved, to carry them back to their own country. If this clause warrants the construction put upon it, and it can fairly be inferred from its provisions that

the wreck of the vessel releases the owner from the payment of wages to the seamen, then it stands ·alone as a solitary regulation by a French duchy for the government of a very limited com- merce on the western coast of France. Nothing of the kind is to be found in the *Consolato del Mare*, a code that from the ninth century had the authority of law from the banks of the Tiber to the Euphrates. (Boucher's Consulate de la Mer, Vol. I., *dedica- tion.*) In the laws of Wisbury, a city of the Baltic built by the Goths, and formerly the most flourishing commercial mart in Europe, whose maritime regulations were far more widely ex- tended than those of Oleron, for they were adopted by all the nations of the North (Olans Magnus Histor. Book.X, chap. 16; Herbstein's Comment. p. 118), the mariners got their wages where they exerted themselves to the utmost of their power to save and preserve the merchandise (Art. XV.); and throughout this justly celebrated code there is no provision, nor anything warranting the inference that seamen at stipulated wages, who have faithfully done their duty, forfeit or lose all their wages if the ship is lost before the completion of the voyage; but in my judgment the contrary is inferrable. Arts. 30, 32, 25, 15, 16, 19. Nor in the Laws of the Hanse Towns of 1597, which at one time embraced a confederation of sixty-two commercial cities—among them the great commercial marts of Lubec, Ant- werp, Hamburg, Bremen, Dantzic and Cologne—is there any provision for the forfeiture of wages by shipwreck, except where the mariners refuse to assist the master to save and preserve what can be rescued from the wreck. As I understand the forty-fifth article, in connection with others, the voyage is re- garded as at an end, when nothing more is to be done in saving and preserving what may be rescued from the wreck, and that for the services rendered up to that time, the master is bound to reward and satisfy the seamen. When that was done, all further claim under the contract was at an end, except that the master was bound to pay the charge of their journey home. Indeed, those laws, though exacting rigorously the faithful discharge of duty, are, as respects the equitable right

of the seamen, characterized by a broad and liberal spirit. After a careful perusal of the code, I find nothing in it countenancing the stern rule of forfeiture which the French writers have deduced from the laws of Oleron, and which has crept into the maritime jurisprudence of England. The laws of Oleron were introduced into England as early as the reign of Richard I.; but it does not appear that the English court derived this rule from that code, or from any examination of the more important and extended maritime code of Europe, but as appears from the reports of *Blackwell* v. *Clark*, and *Cullen* v. *Andrews* (1 Keble, 68, 831), from what was understood to be the *custom of merchants*.

But if such a rule was established by the code of Oleron or existed as a maritime usage or custom among the nations that navigated the North and Baltic seas in the middle ages, there were rights and privileges then exercised by seamen over the conduct and management of the voyage that no longer exist, and which would tend to divest such a rule of much of its rigorous character.

In the early commerce of these nations the seamen were joint adventurers and partners in the enterprise. By the law of Oleron, Art. XVI, the mariner might freight his own share or be allowed for it in proportion to the ship's general freight. The master was bound to consult the crew in every case of emergency. It was a general sea law, that he should not sail out of a port, nor weigh or drop anchor, cut masts or cable, or indeed do anything of consequence, whatever might be the danger, without the advice of the majority of the crew. He was bound to call them together and consult them, and, in many instances, the majority of the mariners determined what should be done. (Law of Oleron, Art. II, Judge Peter's note, 1 Pet. Adm. R.; Law of Wisbury, Arts. 14, 38.) Nor could he pawn or pledge the ship, her tackle or furniture, without their advice, nor could she be abandoned as a wreck without their consent, and by the general regulation the master was chosen by the seamen. In our day a very different state of things prevails. The contract of the

seaman is the ordinary contract of hiring. He is employed for a certain service, at a stipulated rate of wages, and has no voice in the management of the vessel or of the voyage, but is entirely subject to the control and direction of the master. He is a hired laborer and nothing more. The owner may secure himself against loss by an insurance upon the vessel and freight, but seamen are precluded, from well-founded reasons of public policy, from insuring their wages. *Icard* v. *Goold*, 11 Johns. 279. Nor are they entitled to their wages out of the insurance effected upon the freight by the owner. *Finch* v. *The Ship Penelope*, 2 Pet. Adm. 276 ; *Percival* v. *Hickey*, 18 Johns. 257. To sustain a rule, therefore, which visits upon the meritorious seaman a total deprivation of wages for an event which he cannot control, requires something more to support it than the fact that it can be traced up to the usages and customs of the rude, or but partially civilized, nations that navigated the northern seas in the middle ages ; the more especially, when no trace of such a principle is to be found in the Roman law, nor in the laws of those enlightened commercial nations that at the same period navigated the Mediterranean. Pardessus, Lois Maritime, Tom. 1, 325, note 3 ; *The Dawn*, Davies' R. 133. If the experience of modern times has pointed out the necessity of giving the master exclusive control in the management of the vessel, some consideration is due to the changed condition of the mariner. Seamen are not co-operators now, but mere servants, and if their rights are not to be interpreted by the principles which govern in ordinary contracts for hire and service, the reason must be a very strong one which makes their case an exception.

That reason is given in the first English case in which the policy was recognized, at least, the earliest English authority for it, that I have been able to find, is an anonymous case in Siderfin (1 Sid. 179), decided in the reign of Charles II, which is probably one and the same with *Blackwell* v. *Clark* (reported in 1 Keble, 684). Both reports are very imperfect, and all that can be gathered from them·is, that it was a prohibition against a suit in admiralty for seamen's wages in a case where the vessel was lost,

and that, according to the report in Siderfin, " it was agreed that, if the ship does not return, but perishes by tempest or by enemies, the mariners lose their wages, for if the mariners could recover their wages in such cases they would not use their best endeavors or hazard their lives to save the ship," and it was upon the authority of this case and another one (*Cullen* v. *Andrews*, very imperfectly reported in. 1 Keble, 831), that Malloy, the earliest English writer upon maritime law, incorporated in his work the general doctrine which has since been acted upon in England.    Malloy, 8th ed. 249, 274.

Regarded as authorities, Siderfin and Keble have been uniformly treated as of no value.    A cotemporary judge, Dolbin, J., in *Rex* v. *Lee* (1 Show. 252), declared that Siderfin was a book fit only to be burned.    In *Hanson* v. *Leveridge* (2 Vent. 242), the court would not be governed and refused to regard as law an opinion reported by him.    And in *Hayward* v. *Wilson*, Holt, C. J., said that many good cases had been spoiled by him ; that he reported neither with the truth nor with the spirit that the case required.    And in respect to Keble, it is said, in Mr. Wallace's History of the Reporters (p. 207), that Mr. Justice Park burned his copy, not wishing to lumber his library with such trash.    Resting, therefore, upon the statement of two discredited reporters, this case is not entitled to be regarded as a controlling authority.    If it is entitled to any weight at all, it must depend altogether upon the soundness of the reasons alleged to have been given for the judgment.

In the same reign a case came up before Chief Justice Saunders at *Nisi Prius*, which is reported in 2 Show. 283, a book which Chief Justice Holt in *Tate* v. *Whitney* (11 Mod. 196) would not allow to be of any authority, which Lord Hardwicke also declared in *Garth* v. *Colton* (1 Ves. sen. 525) to be of no authority, an opinion confirmed by Lord Abinger in *Sunbolf* v. *Alfred* (3 Mees. & Welsb. 253).    The facts of the case are not given, but it is stated that the Chief Justice ruled three propositions : " 1. That freight is the mother of wages, and wherever freight is due wages are due.    2. If a ship be lost before it come to the last

delivering port no freight or wages are due. If lost afterwards, it is due to the last port of delivery. 3. Where advance money is paid before and in part for freight, and so named in the charter party, although the ship be lost before it come to the port of delivery, yet wages are due according to the proportion of freight paid before, and the freighter cannot have the money."

It is to this case that we probably owe the origin of the maxim that freight is the mother of wages, the soundness of which I shall hereafter examine; and all that it is necessary to say in respect to the case is, that it is not consistent with itself. The third proposition does not follow as a consequence of the first: for if freight be the mother of wages, then, in the case put by Saunders, no freight was earned: and the fact that the freight had been paid for in advance gave the seamen no claim upon a fund to which the owner of the vessel had no title. Upon this point—which would seem to be the only question before the court for decision—the case has long ceased to be an authority. It was expressly repudiated in *Watson v. Duykinck* (3 Johns. 336), where it was held, that the owner was bound to refund freight paid in advance when the vessel was shipwrecked and the voyage broken up. There is another anonymous case (1 Ld. Raym. 539; 3 Salk. 23; 12 Mod. 442), in which Lord Holt, certainly a very great authority, is reported to have held, that "if a ship be lost before the first port of delivery, then the seamen lose all their wages; but if after she has been at the first port of delivery, then they lose only those from the last port of delivery." In the several reports of this case, also, the facts are not given. It does not appear what was decided. The opinion attributed to Lord Holt would be entitled to great weight if it rested upon the authority of reliable reporters; but the 3d of Salkeld was published after the death of the reporter whose name it bears, and the book has never been regarded as of any authority. Wallace's Reporters, 247. The accuracy of the cases in 3d Ld. Raymond has been repeatedly questioned.

1 Burr. 36; 3 Term. R. 261; and the Modern Reports, except a few volumes, are of little weight as books of authority.

In *Hernaman* v. *Bawden* (3 Burr. 1844), the plaintiff shipped for a voyage to Newfoundland, and thence to some port in the Mediterranean. The vessel went to Newfoundland, took in a cargo of fish, but was captured on her voyage from Newfoundland to the port of delivery. The plaintiff brought an action for his wages, but it was held that he could not recover. " The ship was lost," said Yates, J., " before its arrival at the port of delivery; and, as the freighter lost his cargo, the mariner ought to lose his wages."

The next case in which the question arose was *Abernethy* v. *Landale* (Doug. 539), decided by Ld. Mansfield in 1780. The plaintiff, the second lieutenant on board a letter of marque which had been captured by the enemy in the course of her voyage, brought an action to recover his wages. It appeared in the case, that the ship, prior to her capture, took a Spanish vessel, of which the plaintiff was appointed prize master, and that he carried the prize into Lisbon, and remained there in charge of it until it was disposed of by the agents of the owners of the capturing vessel, when he returned to England. He claimed to recover wages, on the ground that he had continued in the defendant's employment until his return to England; that, having been absent in the defendant's employment at the time of the capture of the vessel, he had no opportunity to exert himself in her defence, and that therefore the reason of the rule, by which seamen lose their wages upon the loss of the vessel, did not apply in his case, or that, at all events, he was entitled, upon a *quantum meruit*, to a sum equal to his wages for the care he had taken of the prize. In the decision of the case, Ld. Mansfield distinguished between the double capacity in which the ship set out, as a privateer and as a trader, and held that as a privateer the crew were to share in all prizes taken; and the plaintiff having received his share of the prize, he had no more claim on that head, while all demand on account of the trading voyage was gone. " As a sailor," he said, " on board a ship on a trad

ing voyage, he is entitled to nothing, for freight is the mother of wages, and the safety of the ship the mother of freight."

In *Dunnett* v. *Tomhagen* (3 Johns. 154), the ship, upon a voyage from Greenock to New York, was abandoned at sea as a wreck. The crew exerted themselves to save some of the cargo, and succeeded in stowing away seven boxes of merchandise in the long-boat, to which they took for safety. After being some time at sea, they were picked up by a vessel bound to New York, to which they were brought with the long-boat and merchandise, which were sold at auction by the consent of all parties, and the proceeds of the merchandise were received by the owners of it. The crew of the receiving vessel libeled the long boat and merchandise for salvage, but the libel was dismissed upon the ground that the long-boat was not in a sufficient state of peril to entitle them to claim as salvors. The plaintiff, one of the crew of the lost vessel, then brought an action against the master for wages, on the ground that freight had been earned upon the seven boxes of merchandise, which freight, if recoverable, it was admitted, was sufficient to cover the seamen's wages.

The plaintiffs had judgment in the court below, but it was reversed by the Supreme Court, upon the ground that no freight had been earned. Kent, C. J., following Lord Mansfield, declared it to be a general rule of the marine law, that freight is the mother of wages, and the safety of the ship the mother of freight; that the reason of the rule was, that the seamen might have an interest in the safety of the ship, and be induced not to desert her in case of danger, but to use their utmost endeavors, even at the hazard of their lives, for her preservation; that no freight was earned, as no part of the cargo was delivered by the ship; that a salvor, and not the ship-owner, was the deliverer of the goods saved; that it was not the saving of the cargo, but the earning of freight, that entitled a seaman to wages and that, consequently, no wages were due to the plaintiff, but he suggested that the plaintiff might possibly have a valid lien upon the goods saved for an equitable compensation in the light of salvage.

The case was submitted for the opinion of the court without argument, and for the present it is sufficient to say respecting it, that the observation, that the plaintiff might recover an equitable compensation in the light of salvage, is not in accordance with what is now regarded as the law. *The Massasoit*, 7 Law Rep. 522; *The Starr*, 4 id. 487; *The Neptune*, 1 Hagg. Adm. R. 227; *Nesmer* v. *The Suffolk Bank*, 1 Law Rep. 249; *The Wave*, 2 Paine's C. C. Rep. 147. And that, by the authority of numerous cases, the delivery here was sufficient to entitle the master to recover freight, upon which the seamen had a maritime lien for their wages. *Lutwige* v. *Grey*, cited in Abbott on Shipping, 438; 2 Saund. Pleading & Ev. 2 Am. ed. title Freight, p. 80; Abbott on Shipping, 451; Smith's Mercantile Law, 273.

In *Icard* v *Goold* (11 Johns. R. 279), Platt, J., said incidentally, that "the maxim that freight is the mother of wages implies that if the freight be totally lost by desertion, peril or force, without fraud or misconduct of the masters or owners, the seamen lose their wages; that this has been adopted as a rule of policy, to secure the fidelity and stimulate the exertions of the crew, and all seamen are presumed to know the rule and contract with reference to it. The seamen and owners must be deemed common sufferers. Wages cannot be exacted by the unfortunate seamen from the still more unfortunate owners."

In *Henop* v. *Tucker* (2 Paine's C. C. R. 160), the vessel in the course of the voyage put into the harbor of Cork, in so damaged a condition that it was found that the cost of repairing her would be equal to five-sixths of her value. She was accordingly abandoned to the underwriter, and was sold. The voyage being broken up, the plaintiff, a seaman, was discharged, and the action was brought to recover two months' wages under the act of Congress, the plaintiff having been left in a foreign port. Justice Thompson held that, by the abandonment and sale of the vessel and the breaking up of the voyage, the plaintiff had lost all claim to wages, but appears to have been satisfied with the conclusion he was compelled to adopt, regarding it to be the law. He undertook, in a lengthy opinion, to explain what the rule was, and the

grounds or reasons upon which it rested. He says: "It is the general rule of the marine law that freight is the mother of wages, and that if no freight is earned no wages are earned. It is the settled rule, that in cases of shipwreck, where there is a total physical destruction of the vessel, this will dissolve the contract for wages. * * The loss of wages grows out of the loss of freight and the breaking up of the voyage, so that no further beneficial service can be rendered by the seamen. * * The ground upon which the rule rests must grow out of the nature of the seamen's contract and depending upon some principle of public policy from the nature of the service. In case of wreck or capture, the seaman's contract, without any express stipulation to that effect, is considered contingent and the wages lost." The law annexes or implies a condition, that where the voyage is broken up by some peril or *vis major*, without the fault of the master or ship-owner or any of the parties concerned in the navigation of the vessel, the seamen's wages are gone. The doctrine grows out of principles of public policy, to stimulate seamen to every possible exertion to save the vessel, knowing that their wages depend upon that."

In *The Lady Durham* (3 Hagg. Adm. R.), the vessel and cargo were totally destroyed by fire in the harbor of Ascension, before the completion of the voyage. It was held that the seamen lost their wages. Sir John Nicholl put it upon the ground that no freight had been earned, but in view of some adjudged cases found it necessary to remark, that it did not follow, in all cases, that if there be no freight there can be no wages.

In *The Niphon* (3 Law Rep. [new series] 266), there was a total loss of vessel and cargo. The seamen brought an action *in personam* for their wages, in the United States Court for the district of Massachusetts, but it was held that they could not recover. A very strong effort was made in this case to overturn the rule but it was regarded by Justice Woodbury as too well settled.

In reviewing these cases, the question naturally suggests itself, what is the rule so frequently referred to as well settled? Is it that the right to wages grows out of and depends upon the

earning of freight, and that the seamen lose their wages if no freight is earned? Does this deprivation depend upon the total physical destruction of the vessel or upon the total loss of vessel and cargo, or does it arise where there is a breaking up of the voyage without any fault on the part of the master or owner? If the cargo is lost, but the vessel is saved, do the seamen get their wages? If they do, then, it does not depend upon the earning of freight. On the other hand, do they get them where the vessel is lost and the cargo is saved? If they do, then the safety or preservation of the vessel is not essential to the right. The reasons for the rule are constantly suggested, while the rule itself is left in so loose and undefined a shape as to make it very difficult, by the aid of these cases, to ascertain what it is.

The cause of the difficulty is the assumption and constant reiteration, throughout these cases, of the maxim, that "freight is the mother of wages," the logical deduction from which would be, if the maxim is true, that wages grow out of and depend upon the earning of freight. That, as has been said by several judges, seamen get no wages if no freight is earned. It will be found, however, upon a full examination of the law, that the loss of wages is not founded upon the failure of the vessel to earn freight, but upon a rule of public policy. Before proceeding, however, to point out what that rule is, and the grounds of public policy on which it rests, it will be necessary first to show that wages do not depend upon the earning of freight, and that the maxim as expressed by Lord Mansfield, that "freight is the mother of wages and the safety of the ship the mother of freight," has no foundation in the law. Neither branch of the proposition is true, for seamen may be entitled to wages where no freight is earned, as where a vessel goes upon a voyage in pursuit of freight and returns without getting any; or in cases of jettison, where the cargo is thrown overboard, but the vessel is brought in safety to the port of destination; or where vessel, crew and cargo are lost, but part of the hull and some of the stern are saved by strangers; or where, without fault on the part of the mariners, the vessel and cargo are condemned for illegal trading, or by an ally for want of

proper papers; in all of which cases no freight is earned, but the seamen get their wages. *The Malta*, 2 Hagg. Adm. R. 158; *The Neptune*, 1 id. 229; *The Reliance*, 2 Wm. Rob. 119. And so in respect to the earning of freight; it may be earned though the vessel is totally lost, if the cargo, or any part of it, is saved and delivered to or accepted by the owners; in which case, the seamen have a maritime lien upon it to the extent of the freight earned. *Luke* v. *Lyde*, 1 Wm. Bl. 190; *Hunter* v. *Principe*, 10 East, 378; *The Dawn*, Davies' R. 142; Mar. Ord. of France, title 3, § 21, and the cases and elementary works before cited. Thus, in the recent case of *Bernard* v. *Adams* (10 How. [U. S.] R. 107), where the vessel was abandoned as a wreck, but the cargo was saved, it was adjudged upon general average that the seamen were entitled to their wages, and in *Lutwige* v. *Grey* (*supra*), where part of a lot of tobacco was saved from shipwreck and accepted by the owner, it was held that full freight was due for the part saved, though a portion of it was so damaged as to be valueless.

"The natural and legal parent of wages," in the language of Lord Stowell (*The Neptune*, 1 Hagg. Adm. R. 227), "is the mariner's contract and the performance of the services covenanted for therein. They in fact generate the title to wages." His right is founded upon the fulfillment of his contract, and he has, by way of security, a maritime lien, as old as the laws of the sea, upon the ship, which attaches as long as a fragment of the vessel remains (Consulate de la Mer, Ed. of Pardessus, chap. 132; *The Neptune, supra*), together with a lien upon the cargo, to the extent of the freight earned, founded upon a principle extensively applied in the civil law, that he has contributed by his labor and services to earn it. Emerigon, Traite des Assurances, art. 17, 53; Mar. Ord. of France, book 3, tit. 4, § 19; *The Dawn*, Davies' R. 132. It is very true that the earning of freight is the end proposed by the employment of the mariner and by the prosecution of the voyage, and that it is ordinarily the fruit of his service. But it may or may not be, as in the cases before suggested. The mariner does not engage that the vessel shall

earn freight, or stipulate that if it does not he will make no demand for wages. The scope and extent of the obligation to which he pledges himself in the formation of the contract, as declared by Lord Stowell, in the case of the *Neptune* (*supra*), is that " he will, to the utmost of his ability, navigate the vessel, not only in favorable but in adverse weather, and exert himself, in the event of disaster or shipwreck, to save as much of the vessel and cargo as he can." It is not, then, the earning of freight, but the faithful performance of the obligation, that entitles him to wages, subject only to the risk of losing them when the vessel and cargo are totally lost before the completion of the voyage. It is idle, then, to talk about freight being the mother of wages, in the sense that wages grow out of or depend upon the earning of it. The earning of it gives the mariner an additional security for his wages, as he acquires thereby a lien upon the freight in addition to his lien upon the ship, and this is all that it generates or produces to entitle it to be denominated the mother of wages. The hope and expectation of earning it, as before remarked, lead to the employment of the mariner and the prosecution of the voyage, in which remote and fanciful sense it may be said, figuratively, to be the mother of wages—a sense which attaches no value to it as a legal maxim. I apprehend that this doctrine crept into the English courts, through a practice of the London merchants, by which the contract with the seamen was generally so contrived as to make the wages depend upon the performance of the voyage or the earning of freight. Grose, J., in *Cutler* v. *Powell*, 6 T. R. 324 ; *Edwards* v. *Child*, 2 Vern. 727 ; *Appleby* v. *Dodge*, 8 East, 300. In addition to which, it had long been the custom, in the commerce of the Baltic, not only for seamen to engage at a stipulated rate of wages for the voyage, or by the month, but to freight their share, or to agree that their compensation should be regulated or depend upon the amount of freight earned, as it is usual now for the compensation of a merchant's clerk to be regulated by a per centage upon the profit made in the business of his employer. We find, even in the French commercial code of the

present day, this class who engage for the profit of the voyage distinguished as a less favored class than those who engage at stipulated wages. Art. 257. Si les matelots sont engages au profit ou au fret, il ne leur est du aucun dedommagement ni journees pour la rupture, le retardment ou la prolongation de voyage occassiones par force majeur. Art. 260. Les matelots engages au fret sont payes de leurs seulement sur le fret, a proportion de celui que reçoit le capitaine. Code de Commerce, Liv. II., Tit. V. Of course, if no freight was earned, the seamen so engaging got nothing. I think it very probable, therefore, as the English courts at that time had but a very imperfect knowledge of the maritime law, that they applied to seamen in general a rule applicable only to this class. They did not, as before remarked, derive the rule laid down in Siderfin from any investigation of the maritime codes of Europe, but from what was assumed to be the custom of merchants; and when, to mitigate the hardship of that rule, or to limit it to general operation, Saunders declared that if a vessel stopped at an intermediate port, and by delivering cargo earned freight, the seamen got their wages up to that time, the distinction may well have served to perpetuate the error, by affording some foundation for the belief that wages depended upon the earning of freight. But in whatever way the error originated, the doctrine must now be regarded as repudiated. "It was formerly the doctrine of the English courts," says Ware, J., in *The Dawn* (Davies' R. 133), "that freight was the only fund out of which wages could be claimed, and that where no freight was earned no wages were due;" but he considers the doctrine overruled in England by the case of the *Neptune (supra)*, and declares that it was never received in this country but with material qualification. While Betts, J., a judge of long and great experience in the administration of the maritime law in the city of New York, characterizes this doctrine as an old figment of law exercised oppressively against seamen, 1 Abbot Adm. R. 131.

Dismissing, then, this oft-repeated assertion, that wages depend upon the earning of freight, and that wages are lost if no freight

is earned, as a fallacious assumption, the long adherence to which has tended to embarrass and confuse the law, we approach to a true understanding of the rule or principle by which the wages of the seamen are bound up with and may depend on the fate of the ship.  It is, as before suggested, a rule of public policy, and is to be taken as originally laid down in the anony-·mous case in Siderfin, " that if the ship perishes by tempest or enemies, the mariners lose their wages," and as resting upon the ground of public policy there assigned, that " if it were otherwise the seamen would not use their best endeavors, or hazard their lives to save the ship."  " The *total* loss of the ship," says Lord Stowell, "in the case of the *Neptune* (*supra*), occasioned solely by the act of God visiting the deep with storm and tempest, brings with it the loss of all the earned wages (except advances), although the general rule of law is, that the act of God prejudices no man."

This rigorous, harsh, and inequitable rule, in its operation upon seamen, is founded upon a distrust which makes them an exception to every other class of laborers.  A similar distrust, in respect to the calling of common carriers and inn-keepers, has subjected them from the earliest times to liability in the event of the loss of goods entrusted to their care ; but the grounds upon which their responsibility is founded afford no countenance for the extraordinary extent to which the liability of mariners is carried by the rules we are considering.  The elementary writers upon the law of bailment unite in assigning, as the reason for the extraordinary liability of common carriers and inn-keepers, the temptations to which such persons are under to purloin the property entrusted to their care, the ease and facility with which they may combine with thieves and robbers, and the difficulty of detection and of recovering the lost property in such cases, a distrust which Sir William Jones, quoting from an ancient author, calls " the sinew of wisdom."  Jones on Bailment, 107. But the case of common carriers and inn-keepers is very different from that of seamen.  They have what the seamen have not, the power of direction and control.  It is conceivable in their

case that, by extraordinary care and diligence, loss may be pre-
vented. The carrier undertakes to do, for reward, in a public
capacity, what it is, at least, possible for him to do, and there
may·be no injustice in holding him responsible for the goods,
where their carriage and safe delivery are an act at least within
the range of human possibility, and as the stranger guest con-
fides himself and his property to the care of the inn-keeper, and
it is in the inn-keeper's power, by the exercise of extraordinary
. vigilance, to protect it, there is equally no injustice in holding
him to a similar responsibility. It forms a part of their business
and enters into the contract they make, the one engaging for the
safe delivery, and the other for the safe-keeping, of the goods.
But such is not the case with the seamen. They do not under-
take that the ship and cargo shall be brought in safety to her
port of destination, for they cannot be said to contract to do
what might be impossible. All they engage to do is, to use their
best efforts to accomplish that end, and, when they have done
that, they have done all that is comprehended by·their contract.
The liability of common carriers and inn-keepers, moreover, is
circumscribed within a limit that is just and reasonable, and
when that limit is reached their liability ceases. The carrier is
absolved from all liability where the loss is occasioned by the
act of God, i. e., inevitable accident or casualty, or through
public enemics ; and in the case of the inn-keeper, negligence is
presumed in the event of loss, which he may, however, rebut
by showing that it occurred by the negligence of the traveler, or
was the result of inevitable casualty or of superior force. Story
on Bailments, § 472. But in the case of the seamen there are
no excepted perils. When the vessel and cargo are lost they lose
their wages, however extraordinary their vigilance or untiring
their exertions. They incur this forfeiture when every human
effort must give way to a power in the elements, which they
have neither the skill to avert nor the means to control, and the
question presents the simple consideration, whether, in addition
to the hardships that beset the hazardous vocation of the mari-
ner, it is essential, to secure the faithful discharge of his duty,

Worth v. Mumford.

that he should forfeit his wages, though the vessel is lost by the irresistible power of wind and waves.

To assume, as matter of law, that the mariner will not do his duty unless he knows that his wages depend upon the preservation of the ship, and the safe transportation of the cargo, is to adopt a conclusion not based upon that universal experience which is essential to warrant such a general presumption. Legal presumptions are the natural conclusions drawn by the mind from that knowledge of the usual course of things, which is furnished by ordinary observation and experience, and when such presumptions are founded, as they frequently are, upon a knowledge of human motives or of the springs of human action, they must be founded upon that which may be predicated of mankind in general. To presume, therefore, in respect to seamen, that they will not use their best endeavors for the preservation of the ship unless they know that they will lose their wages if the ship is lost, is to build a presumption on very uncertain premises. The natural desire for the preservation of their own lives may be quite as strong as with the majority of men—a stronger motive to labor for the preservation of the vessel than the hope of pecuniary reward. Mariners, moreover, are quite as distinguished for acts of disinterested heroism and devotion to duty as men of any other class, and that a rigid rule like this is not essential, to stimulate them to the full performance of their duty, is sufficiently attested by the maritime character of the seamen of the many intelligent commercial nations, both ancient and modern, among whom no such rule has ever prevailed. 4 Pardessus, Lois Maritime, 82, Art. 12. There should be, undoubtedly, a strong motive to induce the seaman to peril his life and person for the preservation of the vessel, as not only the safety of the ship and cargo but the lives of all on board may depend upon his exertions, and it is both politic and just that his right to compensation should depend upon the fidelity, faithfulness, and courage with which he discharges that perilous service; that he should forfeit all his earned wages if he has not exerted himself to the utmost to save the vessel and

cargo, or to rescue whatever may be saved from the wreck. This is the qualification of the rule established by the recent English statute (17 and 18 of Vict., c. 104, A. D. 1855), which enacts that, "No right to wages shall be dependent on the earning of freight; and every seaman and apprentice who would be entitled to demand and recover any wages, if the ship in which he has served had earned freight, shall, subject to all other rules of law and conditions applicable to the case, be entitled to claim and recover the same, notwithstanding that freight has not been earned; but in all cases of wreck or loss of the ship, proof that he has not exerted himself to the utmost to save the ship, cargo, and stores, shall bar his claim." Art. 183. This is all that can be rationally or reasonably demanded upon grounds of public policy, for to make his wages depend, as a further inducement to exertion, upon the ship and cargo being brought safely to the port of destination, which may be impossible, is to treat the most meritorious services as of no consideration, unless they are aided by the chances of fortune. If the seamen had, as they formerly had, any voice in determining what should be done in times of peril and danger, there might be some show of reason in making their wages depend upon the fortunate results of their efforts. But now, with a direct interest in the result, they can do nothing to protect that interest that may be contrary to the views of the master appointed to control and direct them. They have not, as they formerly had, the choice of the person to whom the management is confided. They may all be of opinion that the course pursued by the master is not the best adapted to secure the safety of the ship, but they cannot follow the dictates of their own judgment, but must implicitly obey and execute his orders. To hold, them, therefore, responsible to the extent of their wages, for a result which may spring from the incapacity of the master, or which may be inevitable under any circumstances, is to impose responsibility to an unreasonable extent. Where they are without any of the rights or advantages of joint adventurers, but the enterprise is projected for the profit and benefit of the owners, who take upon themselves

the choice of the person who shall guide and direct it, certainly the loss should fall upon them if they have chosen unwisely, or if, subject to the risk which attends all such enterprises, it should result in the inevitable loss of vessel and cargo. In no other case of hire or service is it essential that the service should prove beneficial to the employer. If the employed has done all that he undertook to do, he is entitled to his reward. In the case of the seaman, he does not bind himself by his contract to perform impossibilities. He undertakes to do what it is possible for him to accomplish, and, when he has faithfully done that, to deny his right to compensation is to contravene a rule equally enjoined by divine and human law-givers, that the laborer is worthy of his hire.

In those of the continental nations of Europe, in which the forfeiture of wages is enforced against the seaman, in the event of shipwreck, the rule is at least made consistent by releasing him equally with the owner, in the case of wreck, from all further obligation under the contract, so that he is free to assist or not, in the preservation and saving of the wrecked property. Pothier, Cont. Maritime, No. 127 ; Boulay Paty, Com. de Droit Marit., Vol. II, p. 230 ; Valin, Com. sur la Ord. Marit., Vol. I., 704. Or in those countries where that duty is very properly enjoined upon him, the rule has generally been so qualified that if he has exerted himself to the utmost of his power to save what he can of the vessel or merchandise, he gets his wages, or an equitable compensation equivalent to wages, up to the time when his services in that respect cease, though when he neglects or fails to do so he forfeits the earned wages. This, I think, may be said to be the law in The Hanse Towns, Hamburgh, Lubec, West Capelle, Riga, Wisby, Denmark, and the Netherlands. 1 Pardessus, 471, 522 ; 2 id., 474, 520, 543 ; 3 id., 298, 385, 418, 422, 522, 250; 4 id., 84 ; Degroot, d. l. s., 42 ; V. D. Keessel, Thes. 694 ; 2 Mayens, 114. In Sweden it depends upon whether sufficient for that purpose has been saved from the materials of the vessel. 3 Pardessus, 120. By the French code, if the vessel and cargo are *totally* lost by capture

or peril of the sea, the seamen lose their wages. If, however, some part of the vessel is saved, they are paid out of the proceeds of what is saved; but if that will not suffice, and any part of the cargo is preserved, then they are to be paid as far as the freight upon that will suffice. Code de Commerce, Liv. 2, Tit. 5, Art. 258, 259. But the French jurists treat the contract as dissolved by the act of shipwreck, and as operating to release the seamen from all further obligation and duty; so that, if they exert themselves to save anything from the wreck, they do so because it is their interest to secure what they can of their wages.

But such is not the effect of the shipwreck upon the seaman's contract, as the maritime law has been understood and expounded in this country and in England; but the seaman is bound, by what Lord Stowell calls his " covenanted allegiance to the ship," to exert himself to the utmost of his power to save and preserve whatever can be secured from the wreck, and as long as it is possible to render such a service he continues, in virtue of the contract, under the control and direction of the master. *The Reliance*, 2 Wm. Rob. 119; *The Neptune (supra)*, *The Niphon*, 3 Law Reporter, N. S., 266, 4 id., 496; *The Two Catharines*, 2 Mason, 337; *Pitman* v. *Hooper*, 3 Sumner, 50; *The Dawn*, Davies' *R.* 137; *The Massasoit*, 7 Law Rep., 522; *Visner* v. *Suffolk Bank*, 1 id., 249; Abbot on Shipping, Part 5, Chap 2, p. 271, 6th Am. Ed. ; Curtis on Merchant Seamen, 287, 289. No principle is now better settled in the Admiralty Courts of this country and of England, than that the seaman is bound to render this service by virtue of his contract, and it may now also be regarded as well settled, that he cannot for performing this service have any claim as a salvor, who is under no contract, but is a mere volunteer interposing for the rescue and preservation of wrecked property. If, then, the seaman is bound to labor for the preservation of the wrecked property, and cannot for that service claim as a salvor, the contract continues in force as long as that service continues to be rendered, and its obligations must be reciprocal, for if it is binding on one party

it must be binding on the other. If the seaman is not discharged from the contract by the act of shipwreck, as the French jurists have held, but is bound to labor and service under it as long as a fragment of the vessel or of the cargo can be preserved, neither can the other party be discharged from the obligation to pay him the stipulated wages, as long as he continues in the performance of duties growing out of his contract.

The service in such case continues unaffected by the act of shipwreck, until the services of the seamen are no longer necessary, to which time he is entitled to all the earned wages according to the stipulation of the contract. Both parties are then released from all further obligation under it, and the voyage or adventure is at an end.

The gross injustice of denying the seaman's right to compensation for discharging a duty, that he was held bound by the contract to perform, has been so apparent that we find courts giving him wages in such cases, but calling them by a different name, such as salvage or *quasi* salvage, at the stipulated rate of wages, or wages in the nature of salvage. But it is wages, and not salvage, that he is entitled to. *The Massasoit, supra.* The right to them does not grow out of the fact that enough has been saved from the vessel to pay them. His claim upon the ship arises from his lien, which is a security collateral to the principal contract. It is not created by the act of shipment, but existed from the beginning and is never extinguished as long as anything remains of the vessel. This being the construction of the law, and it is inevitable from the doctrine, that the seaman is bound by the contract to exert himself to the last, to save and preserve what he can from the wreck, it follows that a forfeiture of wages can take place only in cases where there is a total loss of vessel and cargo. This is the only conclusion that will harmonize this doctrine of the extent of the seaman's obligation, under the contract, with the stern rule of forfeiture laid down in Siderfin. It is not necessary to carry that rule further than in the language in which it is laid down in that case: "the seamen lose their wages if the vessel is captured by enemies or lost by tem

pest," by which Lord Stowell would seem to understand a total loss of the vessel, and which, in my opinion, is all that the reason of the rule requires to support it as a rule of public policy. It is a very hard one at the best, now repudiated by the legislation of the enlightened commercial community from which we derived it, and I am not disposed to carry it beyond the strictest limits of the reason assigned for it. We are told in Siderfin that it was agreed, that if seamen got their wages when a vessel was captured by enemies or lost by tempest, they would not use their best endeavors or hazard their lives to save the ship, and in other cases that, upon grounds of public policy, such a general rule is essential to stimulate them to exertion. The object aimed at, in my judgment, is sufficiently accomplished, when it is known among seamen that they will lose their wages if the vessel and cargo are totally lost, and that public policy does not demand that this forfeiture should be enforced in cases where, by the persevering efforts of the crew, the vessel is brought into port, though in so disabled and damaged a state, from the perils encountered, as to be valueless for the further prosecution of the voyage. Reward and not forfeiture should, in my opinion, be the fruit of such a service; as in Spain, where it is rewarded by compensation over and above wages. Ord. of Philip II., of 1563. And I think it a reproach to the law to hold as was held, in *The Wave* (*supra*), that because the vessel was abandoned to the underwriters, and the cargo, being salt, was so damaged as to be valueless, that the seamen, through whose resolute efforts the disabled ship was brought into the harbor of Cork, were entitled to nothing. "Wages cannot be exacted," said Pratt, J., in *Icard* v. *Goold* (*supra*), "by the unfortunate seamen from the still more unfortunate owners;" but that learned judge forgot to distinguish that the two cases are very different, that the owners can secure themselves against loss by an insurance upon the vessel and freight, while seamen are precluded from insuring their wages, upon the ground that, if they were secure of them in any event, they might be indifferent to the discharge of their duty.

My conclusion is, that this rule should be limited to cases

where there is a total loss of vessel and cargo; that, within that limit, it will have all the effect, as a rule of public policy, that it is essential it should have, and that in all other cases the seamen should get their wages up to the time the contract continues in force and they are engaged in rendering service, if they have faithfully discharged that duty. This rule, while it is more just to the seamen, works no injustice to the owners, who can secure themselves against loss by insuring the vessel and the profits of the voyage. In the case before us, as the vessel, by the resolute and persevering efforts of the crew, was brought in safety into the harbor of Pernambuco, and the cargo thereby secured, all that it was the object of this rule to effect has been accomplished, and the seamen, in my opinion, are entitled to wages up to the time that they ceased to be employed.

In arriving at this conclusion, I feel the full weight of departing from what may be regarded as precedent, but the lengthened examination I have gone into, upon the state of the law, will be the best vindication for doing so. "A precedent," says Dr. Lieber, in his excellent work on Legal Hermeneutics, " ought to be sound; it ought to come from good authority, or a period that we consider favorable to a thorough and sound view of the subject in question. * * If we are convinced, after patient inquiry, which includes a thorough knowledge of the subject matter, that we ought in justice to deviate from former decisions, we act wrong in perpetuating that which is unjust or injurious. * * That which is wrong in the beginning cannot become right by lapse of time. * * Many of the most eminent lawyers and the most philosophical among them, such as Lord Mansfield, have acted upon this principle and overruled what was wrong, though with great caution." Lieber's Hermeneutics, Chap. VII, Sec. XIV.

It has been shown how imperfect are the reports of the earlier cases and unreliable as authorities the books of reports from which the law has been drawn; how limited has been the examination of the subject until very recently, and how difficult and impossible it is to reconcile all the adjudged cases with each

other. When, therefore, in the conclusion I have arrived at, I have felt called upon to disregard adjudged cases and the authority of some great names, it has been from a conviction that the question was but imperfectly understood and was not fully examined.

But if my brethren should not be prepared to go the length that I have gone, then the judgment of the court below, I think, may be affirmed upon the ground that freight was earned. The vessel having been brought into the harbor of Pernambuco and the cargo thereby secured in safety, it became the duty of the master or owners to complete their contract with the freightors and transport the cargo in another vessel, if it was in their power to do so, to the final port of destination. *Cook* v. *Jenning*, 7 T. R. 381; *Luke* v. *Lloyd*, 1 Wm. Black, 190. This, it appears, they did, and whether it cost them more or less than the price for which they had originally agreed to carry it, is wholly immaterial so far as respects the rights of the seaman. His right to wages, when he is not in fault, does not depend upon the performance of service on his part, but he is entitled to them if freight, the carrying of which was the object of the voyage, is actually earned. *Chandler* v. *Graves*, 2 H. Black, 606, note. In *Wetmore* v. *Henshaw* (12 Johns. 324), the vessel was captured, and the plaintiff, having been taken on board the enemy's ship, was separated from and did not rejoin the vessel. She was afterwards recaptured, sold by the recaptors for salvage, bought in by the owners, who employed a new crew to navigate her and complete the voyage. In this case, in addition to the amount lost by salvage, the owners had to go to the expense of employing a new crew, *at an increased rate of wages*, to enable them to continue the voyage and carry the cargo to the port of delivery. This increased expense may or may not have been greater than the amount they were to receive originally for freight. That was not inquired into, but the plaintiff's right to wages was upheld, upon the ground that freight was thereafter earned. In the *Louisa Bertha* (14 Jurist, 1007; 1 Eng. Law & Eq. R., 665), the master, in the course of the voyage, executed

a bottomry bond, binding the ship, her cargo and freight, which was payable upon the arrival of the vessel in England. Upon her arrival in England, the vessel, freight and cargo were libeled for the payment of the bond. The vessel was sold, but the proceeds arising from the sale, together with the amount due for freight, were found to be insufficient to satisfy the bond, so that what remained due upon it was a charge upon the cargo. The seamen claimed their wages from the proceeds of the sale, which was resisted by the owners of the cargo, upon the ground that if the seamen were paid out of the proceeds of the sale, that charge would fall upon them, inasmuch as they would have to pay what was due upon the bond to release the cargo. But though a long arrear of wages was due for several voyages made by the vessel before the bottomry bond was entered into, during which she had earned considerable freight, and though the freight was exhausted to meet obligations necessarily entered into on behalf of the vessel, and it was conceded that the seamen had an ample remedy for the wages against the owner; still it was decreed that they should be paid their wages out of the proceeds of the sale, though the practical effect of doing so was, to impose the burden of their payment upon the owners of the cargo. These cases are referred to, to show how far the courts have gone to sustain the seaman's right to wages where freight has been earned. The defendants rely upon what was said by the court in *Porter* v. *Armstrong* (9 Johns. 350), to show that, as respects the right of the seamen to wages, freight has not been earned in the case now before us. But the circumstances in *Porter* v. *Armstrong* were peculiar, and as an adjudication upon the facts, that case is not, as an authority, in conflict with the views here expressed. In that case the seamen refused to proceed with the vessel, when it was their duty to do so, and by that act forfeited their wages. The vessel having put into port to repair, it was found necessary to unload her for the purpose of making the repairs. The seamen had the right to apply, under the act of Congress, for the requisite repairs, but they omitted to do so, and allowed them to be made by the master ship-carpen-

ter under the direction of the owner. When the repairs were completed, the seamen, not deeming the vessel seaworthy, refused to go to sea in her, whereupon the owners refused to make any further repairs, but reloaded the ship and completed the voyage. In deciding the case, the court were of opinion that when the seamen left no freight had been earned, and this was true; but as the court also held that they left wrongfully, inasmuch as they suffered the repairs to be made by the owner. instead of applying to have them done under the act of Congi s, and having thereby brought themselves to abide by the judgm nt of the master ship-carpenter, they had no claim for wages on ie ground that freight was earned afterwards. The court decided, that, having refused to abide by the judgment of the master ship-carpenter, and perform the voyage, that was sufficient to excuse the owner from the payment of wages. In the present case, it is sufficient to say, that as the freight contracted for in the beginning of the voyage was actually earned, though, to earn it, the owners were put to a greater expense than the whole of it amounted to, the seamen were entitled to their wages.

This brings up the only remaining question discussed upon this appeal : the finding of the court below upon the question of desertion. It is insisted that the entry in the log-book was conclusive upon that point, and that the court erred in allowing any evidence impeaching or contradicting it. Under the act of Congress of July 20, 1790 (1 Story U. S. Laws, 102, §§ 2, 6), absence, without leave of the master or officer commanding the vessel, for forty-eight hours, if the fact is entered on the log-book upon the day when the seaman leaves, is a forfeiture of wages. This statutory forfeiture is distinct and different from the ordinary maritime forfeiture of wages by desertion. By the maritime law, the seaman must have quit the ship *animo derilinquendi* or *animo non revertendi*, for however blamable his conduct may be, unless it has been so flagrant as to justify his discharge, if he repents and offers to return to his duty within a reasonable time and before another is substituted in his stead

he must be received. 3 Kent Com. 257, 7 ed.; *Coffin* v. *Jenkins*, 3 Story, 108; *Orne* v. *Townsend*, 4 Mason, 547. The entry in the log-book is evidence of the statutory forfeiture, and, if no other evidence is presented on the subject, it is conclusive. The entry, however, must be a full compliance with the statute, for, in the language of Justice Story, in *Cluteman* v. *Tennison* (1 Story, 373), "in a case so highly penal, nothing is to be taken by intendment." It must appear to have been entered on the day when the seamen left, and it must appear from the entry that he left without leave. *Pheobe* v. *Dijunn* 1 Wash. C. C. R. 48; *Douglas* v. *Eyre*, 1 Gilpin, 152; *Cluteman* v. *Tennison*, 1 Story, 373. Parol evidence, however, is admissible to falsify the entry in the log-book. *Orne* v. *Townsend, supra; Malon* v. *The Mary*, 1 Pet. Adm. R., 140; *Whitton* v. *The Commerce*, ib. 160; *Jones* v. *The Phœnix*, ib. 201. In the latter case, Justice Peters says "the log-book is, by act of Congress, made legal evidence in proof of desertion, but it is not incontrovertible and conclusive," and again, in *Thompson* v. *The Philadelphia* (ib. 210), he says, "the entry in the log-book is only *prima facie* evidence," and it never could have been the intention of the act of Congress to declare that the entry should preclude all further inquiry as to the fact of desertion, and thus place it in the power of the master or officer to forfeit the seaman's wages, by simply making an entry in the log-book that he had left the vessel without leave, when the fact was otherwise.

The entry in the log on March 24th, 1851, that the seamen named "abandoned the ship," is not a compliance with the statute. It is not the entry of a fact, but of the writer's conclusion that they had abandoned the vessel. That the seamen left the vessel without leave, must be entered distinctly as a fact, and not conclusions which may or may not imply that fact. On the next day, the 25th, there is no entry of the absence of the seamen in the body of the log. The transactions of the day, relating to the vessel, such as the state of the weather, the amount of cargo discharged during the day, and the fact that both pumps were kept going almost continually, to keep her free, are

entered, and finished with the words "so ends," but in the margin there is an entry, "the eight men still absent without liberty." Whether the entry, if regularly made, would have been sufficient under the statute, it is not necessary to determine; as the entry was impeached, both by evidence showing that it had been interpolated in the log, and that the fact was otherwise. That the entry was made on the day that it purports to have been, is at least doubtful, as the regular entry for the day in the body of the log appears to have been closed. If it did not occur to the party keeping the log to enter it until after he had completed the regular entries of the day, the natural place for it would seem to have been immediately after those entries; and as is not there, but the regular entries of the next day follow immediately thereafter, the fact, that it is found in the margin, begets the suspicion that it was an after-thought, a suspicion entitled to serious consideration, under a statute so penal in its character. This, however, was not the only circumstance impeaching its integrity. It was proved by the second mate that the entry was not in the handwriting of the mate, by whom the entries in the body of the log were made, and the witness swore also to interpolations in the entry of the day previous, which were not in the mate's handwriting, and were not there when the witness saw him make that entry. This was sufficient to justify the rejection of the log-book as evidence, under the statute, of the fact of desertion, the integrity of the only material entry in it, that could make it evidence under the statute, having been impeached by the testimony of a witness who, on that point, was not contradicted, and whose statement was supported by the suspicious character of the entry itself. If it was insufficient to prove a forfeiture of wages under the statute, the entries in it furnished no evidence of desertion under the general maritime law, for entry in the log-book is evidence only in the case in which the statute makes it so. An entry in the log-book has been received as evidence in certain cases, as when it has been referred to in a deposition affirming the truth of the entries in it. *Falconer* v. *Hanson* (1 Camp. 171), and in a *Nisi Prius* case,

*D'Israeli* v. *Jowet* (1 Esp. 427), it was admitted, though under a doubt, to show the time of the sailing of the vessel, but the general rule now is, that the log-book is not evidence *per se* of the facts contained in it, but is mere hearsay. It is not under oath, does not import legal verity, and parties cannot create evidence for themselves by making entries in it. *United States* v. *Gilbert*, 2 Sumn. 77 ; *United States* v. *Sharp*, 1 Pet. C. C. R. 118. Nothing, therefore, contained in the log book could be received to show a desertion under the statute, or a general maritime desertion ; or, if it was receivable for either purpose, the justice was warranted in finding upon the other testimony, that the seamen had not deserted. The witnesses on the part of the plaintiff swore that the men having complained to the captain that they were unable to work further, he told them that he would see the consul. He did so, and brought the consul on board, who, after hearing the complaint of the men, ordered them to go ashore and that he would find them a boarding-house, to which the captain expressed no dissent, but, on the contrary, told them that the consul had all to do with it. There was some slight conflict of testimony on that point, but, as respects that, the finding of the justice was conclusive.

The judgment should be affirmed.

INGRAHAM, FIRST JUDGE.—I do not deem it necessary, to the decision of this case, to examine into the propriety of the rule that "freight is the mother of wages," or to express any opinion thereon. Taking it for granted that the rule is a proper one, and is the law within this state, I think there is, in the evidence in the cause, enough upon this point to entitle the plaintiffs to a judgment.

The evidence shows the arrival of the vessel, with her cargo, at Pernambuco, where she was condemned and the cargo reshipped for the port of destination by the captain. So far as transporting the cargo to Pernambuco, on the passage homeward, was performed, a rateable proportion of freight was earned ; and if the cost of transportation from Pernambuco to the port

of destination had been at the same rate as that originally agreed upon between the parties, there can be no doubt that the plaintiff would have been entitled to his wages up to the time of the condemnation of the vessel.

But it is contended by the defendants that, inasmuch as the cost of transportation from Pernambuco exceeded the whole amount of freight agreed upon for the whole voyage, therefore the ship earned nothing, and the seamen were not entitled to their wages. To this position I cannot give my assent.

If any portion of freight is earned, whether it be large or small, the whole wages which are deemed to have been earned are to be paid without deduction (*Pittman* v. *Hooper*, 3 Sumner R. 50); and it is a matter of no consequence whether, in balancing accounts, the result will be a profit or a loss. Various causes might operate to make the voyage unprofitable. Capture and detention by an enemy, and a subsequent release, might entirely destroy the profit on the voyage, and yet the seamen would be entitled to their wages; or delay by head-winds, accident at sea, or various other causes might increase the expenses above the freight to be received—still the wages would be recoverable.

There is also another reason, in this case, why wages should be paid. There is no doubt, under our law, that the master was not only justifiable, but that it was his duty, in a case of necessity, to tranship the goods and send them home by another vessel (*Shipton* v. *Thornton*, 9 Adolph. & Ellis, 314; 3 Kent's Com. 212); and where such transhipment is necessary, he may charge the cargo with the extra freight of such renewed voyage. By the extra freight is meant the surplus beyond what the freight would have been if no necessity of hiring another ship had intervened. *Searle* v. *Scovill*, 4 John. Ch. R. 218 ; Curtiss' Rights and Duties of Merchant Seamen, p. 220.

If the cargo can thus be charged with the extra freight incurred by the reshipment, then the freight originally agreed upon is earned in part by the ship first employed, and in part by that to which the cargo has been transferred; and it

follows, of course, that freight has been earned by the transportation of the cargo, and the seamen are entitled to their wages. Nor is there any hardship in this rule upon the owner either of ship or cargo. As to the owners of the ship, the reason of the rule which deprives the seamen of their wages, if the vessel is lost, ceases. By their exertion, both vessel and cargo have been saved and brought into port; and as to the increased expense on the cargo, the owner is protected by his insurance, such increase of freight being recoverable from the insurer. *Mounford* v. *Commercial Ins. Co.* 5 J. R. 262; *Ogden* v. *General Mutual Insurance Co.*, 2 Duer, 204.

There was no error in receiving evidence to contradict the entry in the log-book. If the entry was *prima facie* evidence, it was open to explanation or contradiction; and after the admission of evidence for that purpose, the justice had to decide upon the truth of the entry, and with his decision we do not interfere.

The receipt, even in its terms, was not conclusive upon the seaman as to his claim for the balance of his wages. It only purported to be for his share of the proceeds of the sale of the vessel. Besides, the receipts appear to have been signed under a threat from the consul that, if not signed, they should receive nothing. We have heretofore held, that a receipt in full, signed by a seaman under such circumstances, was obtained by compulsion, and was not sufficient to deprive the seaman of any right to which he was otherwise entitled.

WOODRUFF, J., concurred.

Judgment affirmed.

\*      \*      \*      \*      \*      \*      \*

These conclusions applied to all the cases, but, as different questions arose in some of them, they were passed upon separately, and as follows:

\*      \*      \*      \*      \*      \*

The case of THOMPSON *v.* THE SAME presented nothing different, and the judgment was affirmed.

\* \* \* \* \* \* \*

### In BURBANK *v.* THE SAME.

It appeared that, in adjusting the amount due the plaintiff, the $40 advance money was allowed and the $40 received at Callao. There was no evidence that he received $75 at Callao. The judgment was affirmed.

\* \* \* \* \* \* \*

### In BEALS *v.* THE SAME.

It appeared that the plaintiff received his proportion of the net proceeds derived from the sale of the vessel and gave his receipt for it. The receipt showed that he received the same amount as Wallace, $156. The rate of wages and the time of service in both cases were the same. Beals, however, received but $20 advance and Wallace $40, which may make a difference. It was *held* by the court; that if the plaintiff reduced his judgment less the amount received by him, as disclosed by his receipt, and made his election in ten days, the judgment should be affirmed for that amount, if not, it was to be reversed.

\* \* \* \* \* \* \*

### In COLEMAN *v.* THE SAME.

It appeared that the defendants offered to show a general maritime desertion on the part of the plaintiff, to which he objected, on the ground that the log-book was the only legal evidence of desertion, and the objection was sustained by the court. It was *held* by the court; that this was erroneous. Where the owner means to insist upon a forfeiture of wages, upon the ground of desertion under the statute, it must appear that a proper entry was made in the log-book on the day when the seaman deserted, which is essential to work a forfeiture by virtue of the statute. Proof, therefore, of an entry, that the seaman left the vessel without leave, purporting to have been made on the day he left, is the proper legal evidence to offer,

Worth v. Mumford.

and which must be presented, on the part of the owner, in such a case. But when the owner means to rely upon a general maritime desertion and not a desertion under the statute, which is an absence for forty-eight hours without leave, he is not bound to show the desertion by the log-book. It may be proved the same as any other fact, by the testimony of witnesses. Here the defendants offered to prove, in the broadest terms, that the plaintiff deserted, left, and abandoned the vessel, which they had an undoubted right to do. There are other objections to the judgment, but the error is sufficient to entitle the defendants to have it reversed.

\*       \*       \*       \*       \*       \*       \*

### In HALL v. THE SAME.

It was *held* by the court; that the printed volume of the laws of California was admissible. (Code, § 426), and the reading of the statute of that state, regulating the rate of interest there, was wholly immaterial, as the justice has returned that interest was allowed according to the laws of this state. The certificate of the consul was merely that Hall and the other seamen named in it were discharged upon receiving their proportion of the net proceeds arising from the sale of the vessel. This had no effect upon their claim for the amount remaining due to them. The amount received by Hall, from the proceeds of this sale, does not appear to have been deducted, but wages were allowed him for the whole time he was employed on board the vessel. It does not appear whether, as in Coleman's case, any allowance was made for the expense of the journey home. He was entitled to a reasonable sum out of the proceeds of the vessel, for that purpose *The Dawn* (*supra*), and the amount he received beyond that was a payment in part of the wages due at the time of his discharge. As we cannot adjust the account upon the facts before us upon appeal, or determine the true amount, the judgment must be affirmed. No desertion was shown in the case.

\*       \*       \*       \*       \*       \*       \*

In STEWART v. THE SAME and GRAY v. THE SAME, the following opinions were delivered:

INGRAHAM, FIRST JUDGE.—In these cases the log-book was read in evidence by stipulation between the parties, and by it the plaintiffs were shown to have deserted from the vessel. No evidence to contradict or explain this evidence was offered, and, notwithstanding such proof, the court below rendered judgment for the seamen's wages. In this, I think, there was error.

The log-book was *prima facie* evidence sufficient either to forfeit three days' pay or all previous wages, according to the length of absence, and where it was under a stipulation that it should be received in evidence, it appears to me that the plaintiff is concluded by it, if he does not by any other evidence invalidate or contradict the entry.

As to the other grounds of appeal, we refer to the opinions delivered in *Worth* v. *Mumford et al.*, this term.

WOODRUFF, J. concurred.

DALY, J.—In each of these cases, a stipulation was entered into, that the log-book might be given in evidence, and as no evidence was offered impeaching it, it is insisted that it furnished sufficient proof of a general maritime desertion. The stipulation does not express what effect the log-book shall have as an instrument of evidence. It does not provide that it shall be received as evidence of the facts recorded in it, the same as if these facts had been proved by competent testimony, and the only legal effect of it, as an instrument of evidence, is, that it proves that certain entries were made in it, declaring that these plaintiffs left the vessel without leave, and, as these declarations were not made under oath in a judicial proceeding, they are nothing more than hearsay. Hearsay, when it is admitted without objection and no evidence is given contradicting it, may be sufficient to establish the existence of the fact. It is to be presumed, where a party allows a fact to be proved by such imperfect testimony and gives no evidence to contradict it, that he ad mits the existence of the fact; but I should be unwilling to hold that the plaintiffs, by allowing the log-book to be used in

evidence, meant thereby that it might be received as evidence of a general maritime desertion, or that they meant anything more, or that the stipulation had any greater effect, than that the defendants might show by it, if they could, that the statute had been complied with. I think it would be carrying the stipulation too far, to hold that it allows the defendants to use the log-book as hearsay evidence of general maritime desertion, that the plaintiffs intended, or should be held to have intended, that evidence, so intrinsically weak, so susceptible of fraud, to which neither the test of an oath nor of a cross-examination had been applied, might be received as sufficient and satisfactory evidence against them, of their desertion. It would be admitting away their whole case, acknowledging that they had forfeited their wages, and I think we should not give the stipulation so extended an effect.

But the $40 received at Callao does not appear to have been allowed to the defendants. The plaintiffs should therefore be compelled to reduce their judgment less that amount, and make their election in five days, or the judgment should be affirmed.